```
              UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF CALIFORNIA

JENNIFER CASTILLO and        )
JASON CASTILLO,              )
                             )
            Plaintiffs,      )
vs.                          )CASE NO. 5:15-cv-01743-BLF
                             )
NATIONSTAR MORTGAGE LLC,     )
WELLS FARGO BANK, NATIONAL   )
ASSOCIATION, AS TRUSTEE FOR  )
BANC OF AMERICA MORTGAGE     )
SECURITIES, INC. MORTGAGE    )
PASS-THROUGH CERTIFICATES,   )
SERIES 2006-A and DOES 1     )
through 100 inclusive,       )
                             )
            Defendants.      )
_____)




     DEPOSITION OF PERSON MOST KNOWLEDGEABLE,
                   KEITH KOVALIC
              SAN FRANCISCO, CALIFORNIA
                TUESDAY, JUNE 21, 2016
                10:12 a.m. - 12:42 p.m.




Reported by:   CHRIS DE GEORGE
               CSR NO. 7069
```

Page 30

1  amount of time as well, especially back in 2013; but I
2  was unable to reach that person.
3       MR. ABBOTT: I'll state for the record that
4  Nationstar has produced hundreds of pages of emails, and
5  I don't know off the top of my head if --
6       MS. LETCHER: Yeah. I do.
7       MR. ABBOTT: -- this one is -- has been
8  produced. But I know that Kelsey Grimm, her emails
9  were, I believe, searched in response to earlier
10 requests.
11 BY MS. LETCHER:
12      Q. So when did you try to reach Ms. Grimm?
13      A. Over the past few days by phone and email.
14      Q. And so your under- --
15      What is your understanding about whether there
16 were -- what prior efforts there were to collect emails
17 from her and her work station?
18      A. I don't know if there were any.
19      Q. What was --
20      A. I don't know. I guess not if there were any.
21 I don't know the answer to your question.
22      Q. Okay. When did you first have any contact
23 with the Castillos' case or loan?
24      A. Like I said, two to three weeks ago.
25      Q. Okay. So it began with this deposition.

Page 31

1       A. Yes.
2       Q. I'm going to hand you what's been previously
3  marked as Exhibit 11.
4       Is this a SharePoint request?
5       A. I don't know. This is a Bank of America
6  document.
7       Q. What makes you say that?
8       A. Top of the page it says Bank of America
9  Modification Change Request Form.
10      Q. But you don't have any independent knowledge
11 about whether it's a Bank of America document, do you?
12      A. No, I don't. But let me -- I do want to check
13 one thing just because of when this was generated.
14      Q. Yeah.
15      A. I apologize. I believe I misspoke. But, once
16 again, there were a lot of change request forms on this
17 in the file.
18      Q. You know, let's just forget that question and
19 move --
20      A. I just -- I wanted to make sure I was
21 reviewing the document in -- in context.
22      MR. ABBOTT: I think she's striking the
23 question.
24      THE WITNESS: Okay.
25      MR. ABBOTT: There's no question pending.

Page 32

1       THE WITNESS: Gotcha.
2  BY MS. LETCHER:
3       Q. Because we've got limited time.
4       A. No worries.
5       Q. I think someone else has testified that this
6  is a Nationstar document --
7       A. It is.
8       Q. -- and it took place after that.
9       A. It is.
10      Q. You said that -- so what is a change request
11 form?
12      A. Change request form is, once again, it's an
13 Excel sheet that is emailed to a group in order to make
14 a change to the loan, to request a change. Not to make
15 a change but to request a change.
16      Q. And is this document that we're looking at,
17 Exhibit 11, a translation somehow of an Excel sheet into
18 a different format, or is this the format that it's
19 natively in?
20      MR. ABBOTT: Objection. Compound.
21      THE WITNESS: This is the -- this is the form
22 that it would be in. This is an Excel sheet. It just
23 has the lines erased, essentially.
24 BY MS. LETCHER:
25      Q. Uh-huh.

Page 33

1       A. But there are fields.
2       Q. And you said that there were many change
3  requests in this case.
4       A. Yes. Well -- yes.
5       Q. More than one?
6       A. Yes.
7       Q. How many more than one?
8       A. I want to say five or six, but without going
9  through all 42 pages of Exhibit 8.
10      Q. Okay. And would they all have this format?
11      A. No.
12      Q. What other -- would they have different names?
13 Would they all say "change request form"?
14      A. They would all say "change request form," but
15 this is specific to a Bank of America modification. If
16 you were requesting something else, it would say
17 something else.
18      Q. Okay. And will -- would a change request form
19 say who it's directed to?
20      A. Specifically or generally, like Bank of
21 America modification. It would say -- it usually says
22 the department name of who is handling it.
23      Q. So one of the reasons that we're having the
24 second half of this deposition is because Nationstar
25 represented that there was no key to abbreviations used

Page 34

1  in its servicing records or explanation of what the
2  abbreviations were in existence.
3       Is that the case?
4     A.  In my review of this, I was unaware of any
5  code key, if you will, and --
6       Well, could you tell me which codes you're
7  speaking of?  Are you speaking of the codes that are on,
8  for instance, the column marked "Code" on Exhibit 8?  Is
9  that what you're speaking of?
10    Q.  No.  When we were talking about abbreviations
11 used in Nationstar's records, we were talking generally
12 about any keys that would be available, and because
13 Nationstar represented that there were none, we're going
14 through this much more cumbersome process.
15      But my next question was:  Is the second page
16 of Exhibit 11 a key to codes?
17    A.  Please bear with me.
18      For this -- for this specific department, yes.
19    Q.  Okay.
20    A.  And as it applies to this change request form.
21    Q.  Okay.  Are there any other keys or
22 explanations of codes used in Nationstar's servicing
23 records?
24    A.  Yes.
25    Q.  What are they?

Page 35

1     A.  There are, for instance, on the loan, detailed
2  loan transaction history, instead of -- under
3  "transaction type," there will be a code.  There's a key
4  available for that.
5       In my research of this, I was unaware of it,
6  but I came across that there is for the -- on Exhibit 8,
7  there's a column, it's the second column from the left,
8  that there's a four-alphanumeric code, four-digit,
9  four-letter, sometimes combination of the two, code.
10      I was unaware that there was any key for that,
11 but to be honest, as I testified that I would be, I
12 literally --
13    Q.  We skipped that part, but we assumed it, I
14 think.
15    A.  I -- I literally stumbled across a key for
16 those abbreviations there.
17    Q.  Is that the key that Ms. Grimm was discussing
18 in her deposition?
19    A.  Yes.
20      (Exhibit 52 was marked.)
21      MS. LETCHER:  I'll hand you Exhibit 52.
22      MR. ABBOTT:  It's a one-page exhibit, Counsel;
23 is that right?
24      MS. LETCHER:  Yes.
25      MR. ABBOTT:  And, Counsel, I need to -- I need

Page 36

1  a break.
2       MS. LETCHER:  Okay.  Sure.
3       Let's go off the record.
4       MR. ABBOTT:  Thank you.
5       (Recess taken 11:05 a.m. - 11:15 a.m.)
6       MS. LETCHER:  Okay.  So we should go back on
7  the record.
8  BY MS. LETCHER:
9     Q.  So is Exhibit 52 a SharePoint request?
10    A.  Yes.
11    Q.  Are the attachments listed, the email chain
12 and the spreadsheet, part of the SharePoint request?
13    A.  Yes.
14    Q.  And were they disclosed in this case?
15    A.  I believe so.
16    Q.  Okay.  And they would have been disclosed
17 together with this document?
18      MR. ABBOTT:  I'll represent I don't think that
19 they were disclosed with this document, and I don't know
20 if the emails were disclosed separately or -- or not.
21 Given the high value of document production, I don't
22 remember off the top of my head.
23 BY MS. LETCHER:
24    Q.  And are attachments to SharePoint requests
25 stored, archived, deleted in the same way that the

Page 37

1  SharePoint request itself is?
2     A.  Yes.
3     Q.  Okay.  Is there a different kind of SharePoint
4  request for requests that come from borrowers?
5     A.  Yes.  If I can read directly from Exhibit 52:
6  "This [specific] SharePoint should only be utilized for
7  non-borrower requests adjustments to the loan."  And
8  then it says -- it's highlighted on a computer screen
9  but it's in a lighter color here:  If the borrower is
10 requesting the adjustment, please utilize the Correction
11 (CORR), SharePoint.
12    Q.  Were there any borrower request SharePoints in
13 this case?
14    A.  Yes.  There was at least one.
15    Q.  Okay.  Can you tell, quickly, approximately
16 what date that would be?  Or do you remember what year
17 it was?
18    A.  It was in 2015.
19    Q.  Okay.  And has that been disclosed?
20    A.  I believe so.
21    Q.  Okay.  And what would it look like?
22    A.  It would look more similar to Exhibit 11.
23    Q.  Okay.
24    A.  As it would go through an email, not a
25 SharePoint.

Page 54

1  information does come your way, it's going to be in an
2  Excel sheet most likely or something printed off of a
3  sequel database.
4  BY MS. LETCHER:
5      Q.  Okay.
6      A.  It's not going to be all pretty on this.
7      Q.  Okay.
8      A.  And then I wanted to clarify, on the
9  April 15th letter, I believe I said I talked to Derek
10 Savells.  I -- I didn't talk to Derek.  He -- his name,
11 obviously, is on this file so that was just a confusion
12 thing.  And if there was any confusion between me saying
13 the name David and Derek, because they're similar -- I
14 know David Grasham for a fact does no longer work for
15 Nationstar, so I know I didn't talk to him.
16     Q.  Okay.
17     A.  But I attempted to reach him only to find out
18 he's no longer employed there.  And same with Derek.  So
19 I believe that was just a minor.
20         After reviewing all the documentation on
21 this --
22     Q.  Yeah.
23     A.  -- there were a lot of names.
24     Q.  So on that list, which people did you actually
25 speak to?

Page 55

1      A.  Ashley Lind was the only one that I was
2  actually able to reach.
3      Q.  Okay.  So switching gears for a second to
4  Topic 6, records of mortgage payments that are received
5  and rejected, does Nationstar have records of mortgage
6  payments that are received and rejected?
7      A.  No.
8      MS. LETCHER:  Mark this one as 53.
9      (Exhibit 53 was marked.)
10 BY MS. LETCHER:
11     Q.  Have you ever seen a record --
12     MR. ABBOTT:  Do you have a copy for me,
13 Counsel?  Oh.
14 BY MS. LETCHER:
15     Q.  Have you ever seen a record that looks
16 anything like this?
17     A.  I have not.
18     MS. LETCHER:  Okay.  Mark this one as 54.
19     (Exhibit 54 was marked.)
20 BY MS. LETCHER:
21     Q.  So I'll represent to you that this is a record
22 of my client's -- from my client's bank statement
23 showing that he made an online payment on
24 September 12th, 2014, and Nationstar rejected it on
25 September 18th, 2014.

Page 56

1      **Is there any place in any Nationstar system**
2  **where this payment and the fact that Nationstar held the**
3  **payment for six days would be recorded?**
4      MR. ABBOTT:  I should object to Exhibit 54 on
5  the basis that it -- it assumes the information on this
6  document is correct, and therefore, any questions would
7  call for, at some level, for speculation by the witness.
8      And this is not a business record of
9  Nationstar.
10     THE WITNESS:  Yes.  I was about to say, I've
11 never seen this.
12     Do you mind if I read it real quick?
13     MS. LETCHER:  Sure.  No problem.
14     MR. ABBOTT:  If the court reporter could
15 restate -- could repeat the question, please.
16     (Record read.)
17     THE WITNESS:  I would need to have in front of
18 me -- if Nationstar ever actually cashed this, it would
19 be in the loan -- the detail transaction history, and I
20 would need to have that in front of me to verify that
21 that was, in fact, there.  But what also is a payment of
22 -- I'm sorry.  I was looking at the wrong column there.
23     Yeah, this is just -- I -- I don't really know
24 how to read this because, you know, the payment number
25 is 140912.

Page 57

1  BY MS. LETCHER:
2      Q.  **I wasn't asking you about this record.  I was**
3  **asking you a more general question.**
4      **If an electronic payment for a mortgage**
5  **payment came to Nationstar and was held by Nationstar**
6  **for more than 24 hours, say, and then rejected, is there**
7  **any place in Nationstar's records that that would be**
8  **reflected?**
9      MR. ABBOTT:  Objection.  Vague and ambiguous
10 as to "held."
11     THE WITNESS:  The only way that it would hit
12 the detailed loan transaction would be if it was ever
13 cashed.
14 BY MS. LETCHER:
15     Q.  **Is there any other system at all in**
16 **Nationstar's records or any vendor of Nationstar, any**
17 **way that Nationstar could tell that a homeowner had**
18 **tendered an electronic payment which was subsequently**
19 **rejected by Nationstar?**
20     A.  Not that I'm aware of.
21     Q.  Okay.  This second page I'll represent to you
22 is also -- it is an email from my client's bank
23 informing him that a payment has been rejected.  It
24 suggests a couple of possible reasons why this might
25 happen, for example, your account has been closed, your

Page 58

1  account has a credit balance.
2      My question to you is not about this document,
3  but is there any loan setting or status or condition
4  that would cause Nationstar to reject electronic
5  payments from a homeowner?
6      A.  Generally speaking, if it's less than the
7  contractual payment amount, if the homeowner is
8  delinquent, meaning more than -- not late, but
9  delinquent, so more than 30 days delinquent, sometimes
10 that will stop bill pays from being accepted.
11     Q.  And is there a -- a system or a code or a
12 setting that causes that to happen?
13     A.  A setting on Nationstar's side?
14     Q.  Yeah.
15     A.  It's -- I don't know.
16     Q.  What if the homeowner disputes the amount due
17 and submits the amount that they believe is due, is
18 there any record that that amount has been submitted or
19 tendered to Nationstar?
20     A.  Only if the payment is accepted in any way and
21 put into, say, suspense, given the situation you've
22 given me.
23     Q.  So there is some function at Nationstar,
24 you're not sure what, that would reject payments under
25 certain circumstances, including being delinquent or a

Page 59

1  payment being less than the amount that Nationstar
2  believes is contractually due.
3      A.  Well, I'm talking specifically about
4  electronic payments.
5      Q.  Yeah.
6      A.  Yes, that's my testimony as it applies to
7  electronic payments, not, say, a --
8      Q.  A check?
9      A.  A money order or a check, yes.
10         MS. LETCHER:  Sorry.  It's a little
11 distracting.
12         MR. ABBOTT:  Do you want to wait for a second?
13         MS. LETCHER:  Yes.
14         (Discussion off the record.)
15 BY MS. LETCHER:
16     Q.  For loans where servicing has been transferred
17 from Bank of America to Nationstar, are Bank of America
18 system of records, servicing records, available in any
19 form to Nationstar employees?
20     A.  Yes.
21     Q.  What form is that?
22     A.  Any documentation that they send over with the
23 loan during the onboarding process would be placed in
24 the FileNet on -- in its own group as previous servicer
25 documentation.

Page 60

1      Q.  Do Nationstar employees have --
2          Are you familiar with the term "AS 400"?
3      A.  Yes.
4      Q.  Do Nationstar employees have access in any
5  manner to Bank of America AS 400 records for transferred
6  loans?
7      A.  Yes.
8      Q.  And how would they do that?
9      A.  Once again, during the, we call it the
10 onboarding process when the loan is in the process of
11 being transferred, the AS 400 notes are usually, not
12 always, but usually part of the transfer process.
13     Q.  Were they part of the transfer process in the
14 Castillos' loan?
15     A.  Yes.
16     Q.  So they're available to Nationstar?
17     A.  Yes.
18     Q.  Have they been produced?
19         MR. ABBOTT:  I'll represent I believe that
20 happened.
21         MS. LETCHER:  I'm sorry.  I didn't hear you.
22         MR. ABBOTT:  I'll represent I believe they
23 have been.
24         MS. LETCHER:  Okay.  Maybe at a break you can
25 direct me to them, please.  I'm pretty sure we wouldn't

Page 61

1  be having this dispute if they had, so...
2  BY MS. LETCHER:
3      Q.  Have you -- is it your understanding that
4  they've been disclosed?  Have you seen them?
5      A.  I've seen them in FileNet, Nationstar's
6  system, but in terms of them being disclosed, that's
7  something I would have to refer to counsel on.
8      Q.  Okay.  And that would be AS 400 records for
9  the entire time that the loan was with Bank of America?
10     A.  Yes.  To the best of our knowledge, the pages
11 are numbered, so if we have pages 1 through 10, but we
12 don't have, say, 11 and 12, we can't request what we
13 don't know.  But if we have pages 1 through 4 and 6
14 through 10, we know we're missing 5.
15     Q.  Okay.  Going back to topics in 1(a), are
16 there -- were there audits in this case?
17     A.  Yes.
18     Q.  What -- what is an audit?
19     A.  An audit is a systematic -- not systematic in
20 the sense of a certain system, but just a systematic
21 review of a specific area of inquiry and to make sure
22 that that is accurate with other information provided.
23 It's usually done by a third party and not somebody that
24 initially entered the information.
25     Q.  Third party external to Nationstar or

Page 66

1  MR. ABBOTT: Sure.
2  (Off record 12:11 p.m. - 12:37 p.m.)
3  BY MS. LETCHER:
4  Q. So the second part of this deposition is
5  related to abbreviations that are used or codes that are
6  used in servicing records related to this loan that
7  Nationstar produced so far.
8  Exhibit A to the deposition notice is a
9  13-page list, and you've only gotten through about part
10 of it, so what -- about half of it. So what we've
11 agreed to do is treat this list as a deposition by
12 written questions, and that your responses will be
13 filled in by hand, typed, however you want, on the
14 right-hand column, and those will be treated as the
15 response of Nationstar, the person most knowledgeable,
16 about what those abbreviations mean; is that correct?
17 A. That is correct.
18 Q. Okay. And what we agreed to do was that when
19 you complete that, we will send it to the court
20 reporter. She has prepared an exhibit sticker for you
21 that you can put on the exhibit, and then we'll treat
22 that as an exhibit to this deposition. And we agree
23 that we don't need to have it notarized. It will just
24 be the equivalent of your testimony under oath.
25 Correct?

Page 67

1  A. Correct.
2  Q. The foundational question I wanted to ask you
3  is that when I was putting together this list, I did it
4  because the Nationstar representative didn't have any
5  kind of key. I tried my best not to -- not to reproduce
6  each code each time it appeared but just to put it once.
7  And I was making the assumption that the abbreviation is
8  used the same way -- used to mean the same thing each
9  time it's used.
10 Is that generally the case?
11 A. Yes.
12 Q. Okay. Before you -- before we went on the
13 record, Mr. Abbott was explaining you were trying to
14 look at these abbreviations in context to understand
15 them.
16 Were there any that you've come across so far
17 that were used in a context that would make them
18 different from -- the meaning different from the meaning
19 were it used in a different spot in the records?
20 A. Not necessarily, no.
21 Q. Okay.
22 A. Not not necessarily. No.
23 Q. The comma's important.
24 Can we make some sort of agreement that if
25 there's something that's come across -- comes across

Page 68

1  that's used differently in different contexts, that you
2  can note that it's not an abbreviation or something like
3  that?
4  MR. ABBOTT: We can. We'll -- we'll note that
5  it's context-sensitive.
6  MS. LETCHER: Okay. Perfect.
7  MR. ABBOTT: And that way you're aware of it
8  when you're doing the deposition of the Rule 30(b)(6)
9  witness in August.
10 MS. LETCHER: Okay.
11 MR. ABBOTT: And then towards this, 'cause
12 this is sort of a foundational question but also kind of
13 saying on the record what we were talking about in how
14 to handle this, is that there are a series of
15 abbreviations that come from servicing documents or
16 notes that were Bank of America records, and we talked
17 about this offline.
18 I think Mr. Kovalic is authorized to bind
19 Nationstar in -- in completing this as part of the
20 written portion of the deposition as to Nationstar's
21 understanding of those abbreviations but is not
22 representing that he's going to find -- call up Bank of
23 America or do any research along those lines to find out
24 what Bank of America thinks of it. He's not authorized
25 to that extent.

Page 69

1  And let the record show that counsel's shaking
2  her head.
3  MS. LETCHER: I am nodding my head in
4  agreement.
5  MR. ABBOTT: So we're all on the same page
6  with respect to that issue, right?
7  MS. LETCHER: Yes.
8  And you are going to be able to complete this
9  by the end of today? Tomorrow?
10 MR. ABBOTT: Tomorrow. If it's completed
11 sooner, we'll give it to you as soon as it's complete by
12 email in PDF format.
13 MS. LETCHER: Okay. And in any event, Madam
14 Court Reporter, would it be better to send it directly
15 to you by email or to me?
16 THE REPORTER: I think it should go to you
17 first and you send it to me.
18 MS. LETCHER: So if you can send me a copy, I
19 will distribute it to both the court reporter and to
20 you.
21 MR. ABBOTT: Thank you.
22 MS. LETCHER: No, I'm not going to send it
23 back to you. I'll copy you on the email.
24 All right. I think that's it. Thank you so
25 much for your time.