1  William E. Kennedy State Bar No. 158214
   CONSUMER LAW OFFICE OF WILLIAM E. KENNEDY
2  2797 Park Avenue, Suite 201
   Santa Clara, California 95050
3  Telephone: (408) 241-1000
   Facsimile: (408) 241-1500
4  Email: wkennedy@kennedyconsumerlaw.com

5  Robert David Humphreys, OBA #12346, *Pro Hac Vice*
   Lucius James Wallace, OBA #16070, *Pro Hac Vice*
6  HUMPHREYS WALLACE HUMPHREYS, P.C.
   9202 S. Toledo Avenue
7  Tulsa, OK 74137
   Telephone: (918) 747-5300
8  Facsimile: (918) 747-5311
   Email: david@hwh-law.com; luke@hwh-law.com
9
   Elizabeth S. Letcher State Bar No. 172986
10 LAW OFFICES OF ELIZABETH S. LETCHER
   60 29th Street, No. 221
11 San Francisco, CA 94110
   Telephone: (415) 643-4755
12 Facsimile: (415) 738-5400
   Email: elizabeth@elizabethletcher.com
13
   Attorneys for Plaintiffs
14 JENNIFER AND JASON CASTILLO

15

16              UNITED STATES DISTRICT COURT

17             NORTHERN DISTRICT OF CALIFORNIA

18
   JENNIFER CASTILLO and JASON          DECLARATION OF ELIZABETH
19 CASTILLO,                            LETCHER IN SUPPORT OF
                                        PLAINTIFFS' MOTION FOR
20            Plaintiffs,               ATTORNEY'S FEES AND COSTS

21       v.                             Case No. 5:15-cv-01743-BLF

22 NATIONSTAR MORTGAGE LLC,             Date: August 24, 2017
   WELLS FARGO BANK, NATIONAL           Time: 9:00 a.m.
23 ASSOCIATION, AS TRUSTEE FOR BANC     Courtroom: 3, 5th Floor
   OF AMERICA MORTGAGE SECURITIES,
24 INC. MORTGAGE PASS-THROUGH           Action Filed:   March 19, 2015
   CERTIFICATES, SERIES 2006-A and
25 DOES 1 through 100 inclusive

26            Defendants.

27

28

   _____
   DECL. OF ELIZABETH LETCHER ISO PLS' MOTION FOR FEES, COSTS AND EXPENSES

I, Elizabeth S. Letcher, declare:

1. I am counsel for Plaintiffs in this action. I submit this declaration in support of Plaintiffs' Motion for Attorney's Fees and Costs. I have personal knowledge of the matters set forth herein, and if called to testify, would and could competently testify to them. Some of the facts I include here relate to hours spent by Mr. Kennedy. He has reviewed them and could testify to them as well, as stated in his declaration.

2. This declaration sets out the course of the litigation in detail, and attempts to break down litigation into stages and hours. Though the tasks in this case do not always neatly fit solely within one category, and some tasks could be placed in more than one category, I have endeavored to so organize this declaration for the court's convenience.

3. Attached as Exhibit 1 hereto is a summary of time I expended on the merits of this case for which the Plaintiffs seek compensation. The summary is based on contemporaneously kept time records I maintained in the regular course of business. Fewer than ten hours have been reconstructed from correspondence or my co-counsel's time records. As set forth in the summary, I seek compensation for approximately 756 hours on the merits of this case through January 10, 2017.

**Previous Litigation**

4. As set out more fully in paragraphs 88-91 below, my practice has focused on foreclosure, mortgage servicing, and debt collection cases since I was a staff attorney and later the Litigation Director at an Oakland nonprofit, Housing and Economic Rights Advocates or HERA. While I was at HERA, I represented Jennifer and Jason Castillo, together with attorney William Kennedy, in a 2012 suit against Bank of America and investor defendant here, Wells Fargo. *Castillo v. Bank of America, N.A.*, Santa Clara County Superior Court, Case No. 112CV233256 ("*Castillo I*"). That suit was filed to enforce a 2010 loan modification contract that Bank of America had extended to the Castillos and then unilaterally "cancelled."

5. In 2013, as the parties in *Castillo I* were negotiating a new loan modification as part of the settlement process, servicing of the Castillos' loan was transferred to Nationstar. Both I and George Keller, the attorney representing the Defendants in *Castillo I*, contacted

1  Nationstar about the modification, and Nationstar assured the parties to *Castillo I*, through Mr.

2  Keller, that it would honor the modification.

3  6.    Nationstar received and implemented the modification.   However, it did so

4  incorrectly.   Nationstar improperly charged the Castillos approximately $20,000 in escrow and

5  legal fees.  Beginning in April, 2014, Nationstar raised the Castillos' monthly payment from

6  $3,046.80 to $5,115.46 in an attempt to recoup these wrongful charges. ECF 78-10 p. 17.  When

7  the Castillos continued to make the $3,046.80 payment, Nationstar considered their account to

8  be in default.

9  7.    The Castillos called Nationstar multiple times to resolve the issue, but Nationstar

10  told them that the accounting was correct.  The Castillos then contacted Mr. Kennedy, who,

11  beginning in May 2013, sent a series of five dispute letters over the next 9 months under the

12  Real Estate Settlement and Procedures Act.   ECF 86-5; 86-7, 86-9, 86-11, 86-13 ("Notices of

13  Error").  The letters explained that that the modification had recapitalized all overdue amounts,

14  including allegedly overdue escrow, so that the Castillos' timely payments of the monthly

15  modification amounts in fact made them current.  Nationstar denied any error in response to the

16  letters, and instead, started rejecting the Castillos' monthly payments, still demanding thousands

17  of dollars not due.   By January 2015, Nationstar claimed the Castillos were over $41,000

18  overdue on their mortgage. ECF 78-10 p. 38 (statement).

19  8.    On February 20, 2015 Nationstar wrote a letter to Mr. Kennedy which admitted

20  that Nationstar had improperly demanded $19,640 for escrow charges that had been resolved by

21  the 2013 Loan Modification. ECF 86-12.  However, Nationstar did not fix the accounting to

22  remedy that error.   It still claimed the Castillos were tens of thousands of dollars overdue and

23  continued to reject payments. Nationstar started the foreclosure process by recording a Notice of

24  Default, which was served on the Castillos on February 24, 2015.  ECF 79-10.

25  9.    At that point, the Castillos were forced to commence this litigation to prevent

26  foreclosure on their home. The Complaint was filed in state court in March, 2015 and removed

27  to this Court by defendants. ECF 1.

28

DECL. OF ELIZABETH LETCHER ISO PLS' MOTION FOR FEES, COSTS AND EXPENSES

10.     Plaintiffs' counsel spent a total of 51.6 hours in pre-complaint advocacy and preparing the Complaint.  Mr. Kennedy handled the pre-complaint legal analysis, research, and the Notices of Error and credit complaints that led to Nationstar's partial admission of error, expending a total of 25.1 hours on these tasks.  I joined the suit as co-counsel as the Complaint was being prepared.  Mr. Kennedy spent 19.8 hours and I spent 6.7 hours preparing the Complaint. *See* ECF 1 (Notice of Removal) at 7-45.

### *Castillo v. Nationstar*

11.     The Castillos' suit had two goals.  The first was to stop the foreclosure and force Nationstar to accurately implement the modification.  Due to Nationstar's ongoing failure to examine its flawed accounting (described below), and because of Nationstar's litigation tactics, resolving the accounting issues so as to remove the risk of foreclosure and correct credit reporting took much more time than expected or necessary.

12.     Plaintiffs built their case for both compensatory and punitive damages by thoroughly investigating Nationstar's handling of the loan, and showing, by careful depositions of front-line employees, that each of the individuals handling the Castillos' loan was completely unequipped to understand, much less correct, errors on the loan.   That discovery – the core of the strong affirmative case for damages, is described in more detail below.   However, the majority of hours spent in this case were focused on issues and problems created by Nationstar's own aggressive litigation tactics and failure to investigate and correct its accounting until well over a year into the suit.

### Amendment In Response To Motion to Dismiss

13.     Nationstar moved to dismiss the Complaint, arguing Nationstar could not be liable because the Castillos did not "include Nationstar and/or Wells Fargo in the transaction for the 2013 Modification" or allege facts showing a contract between the parties.  ECF 16 at 10:1-12, 14:9-14; a true and correct copy of relevant excerpts is attached hereto as Exhibit 2.  In essence, Nationstar argued that its errors in implementing the modification were to be expected because plaintiffs allegedly left Nationstar "out of the loop" when negotiating the modification, and thus the Complaint was deficient.  Putting aside the fact that Motion to Dismiss was hardly

the place to assert such arguments, Nationstar's position was starkly contradicted by the facts. In fact, not only did the Castillos contact Nationstar directly, ECF 81-2, 81-3 (email and Nationstar response), but Nationstar and Bank of America had months of communication about the modification as it was being finalized, and Nationstar's own legal counsel and vice president approved the modification. *See* ECF 79-6 (email communications); a redacted copy of the relevant pages of the settlement, reciting that the modification is binding, and signed by A.J. Loll, is attached hereto as Exhibit 3. Plaintiffs ultimately decided to counter Nationstar's patently false factual assertions by simply filing a more detailed amended complaint, setting out the communications and spelling out the agency relationships. ECF 18, ¶¶ 23-60. Nationstar did not renew its motion after the First Amended Complaint was filed. I spent 18.9 hours, and Mr. Kennedy spent 6.7 hours, handling the Motion to Dismiss and First Amended Complaint.

**Accounting**

14.     Plaintiffs expected that defendants would stop the foreclosure and would correct the accounting errors on the account immediately after suit was filed. In fact, plaintiffs were able to negotiate a stipulation whereby Nationstar rescinded the Notice of Default in return for Plaintiffs' withdrawal of their California Homeowners Bill of Rights claim. ECF 15.

15.     During a July 23, 2015 phone call with the Court's ADR Administrator Howard Herman, Defendants' counsel Thomas Abbott expressed concern that Nationstar might foreclose on plaintiffs' property if the accounting dispute was not resolved. In response, Plaintiffs suggested that the parties set out their calculations and rationale for the amounts actually due, so that the foreclosure and accounting issues could be put to rest. Plaintiffs agreed to do so first. Plaintiffs set out their version of the accounting in a May 29, 2015 letter, a true and correct cop of which is attached as Exhibit 4. Nationstar never responded to the letter. After waiting for over a month for a response, Plaintiffs recast their May 29, 2015 letter as a Notice of Error under RESPA, which I mailed on July 8, 2015. Plaintiffs never received a response to this letter either.

16.     An enormous amount of the time spent by Plaintiffs' counsel over the following year and a half could have been avoided if Nationstar had made a genuine or competent effort to resolve the accounting issues at that time. Instead, Plaintiffs' counsel were forced to spend

DECL. OF ELIZABETH LETCHER ISO PLS' MOTION FOR FEES, COSTS AND EXPENSES

hours poring over Nationstar's undecipherable accounting records to be able to prove what Castillos owed and what Nationstar had charged. Nationstar repeatedly stripped payments from the account and reapplied them, without informing the Castillos or explaining the process to them, making the records all but impossible to decipher. Each additional stripping and reapplication made the records even more indecipherable. An example of these records, a true and correct copy of the Castillos' transaction history received from Nationstar, is attached as Exhibit 5.

17. Plaintiffs ultimately sent five post-filing Notices of Error, summarized below.

| Date | Subject | Response |
|---|---|---|
| NOE No. 6<br>May 29, 2015 and July 8, 2015 (This letter was a follow up to the May 29th letter directed to Nationstar's counsel which was ignored)<br><br>ECF 86-13 | Disputed Nationstar's accounting and contention that the account was not current; disputed $2,289.06 monthly escrow charge; Disputed late fees, legal fees, and property inspection fees. | None |
| NOE No. 7<br>December 24, 2015<br><br>ECF 86-15 | Disputed 2014 Form 1098 which stated that Castillos only paid $5,760.92 in mortgage interest | Nationstar acknowledged an error, but issued a new 1098 from showing even less mortgage interest had been paid - $4,102.37. The correct amount should have been $9,830.27. No explanation of how this amount was calculated was provided. |
| NOE No. 8<br>February 1, 2016<br><br>ECF 86-16 | Disputed 2015 Form 1098, which stated that Nationstar paid $124,106.91 in mortgage interest. | None. |
| NOE No. 9<br>February 19, 2016<br><br>ECF 86-17 | Disputed the amount due, explained plaintiffs' calculation of the amount due, requested that Nationstar correct the account, accept payments and bring the account current. Requested information | None. |

| | | |
|---|---|---|
| | about and disputed charges to their account other than principal, interest and escrow. | |
| NOE No. 10<br>May 4, 2016<br><br>ECF 86-20 | Disputed the amount due, disputed Nationstar's payment history which did not reflect the Castillos' March 2016 payment, included charts comparing the amount paid to the amount properly due, demanded an explanation for any charges in excess of those amounts, and demanded the Castillos be removed from foreclosure status | None. |

18.     Plaintiffs also pursued resolution of the accounting issue through formal discovery. Plaintiffs served their first set of discovery on July 7, 2015. Interrogatory No. 2 sought a breakdown of the amount due for principal, interest, escrow and other fees each month. Nationstar evaded the question. It responded that "the amounts YOU were in arrears is itemized on the Mortgage Loan Statements which are produced with Bates numbers NSR 0517 through NSR 0592". At the same time, Nationstar contradicted itself by disclaiming the accuracy of its statements. Nationstar responded to Interrogatory No. 7, which describe whether and how Nationstar ever informed plaintiffs of the correct amount to pay, as follows: "Nationstar does not contend that it informed PLAINTIFFS of the correct monthly payment amount.". Nationstar did at least state in response to No. 6 that at least $3,365.48 was due per month (over $1,000 less than its previous monthly demands). *See* ECF 78-5.

19.     This amount was not correct, and would ultimately be retracted by Nationstar. However, Plaintiffs immediately responded, by letter dated September 24, 2015, stating that they disagreed with that calculation but wanted to pay the amounts that the parties agreed on to bring their amount current. ECF 78-6. The letter set out their calculations based on Nationstar's explanation, and the Plaintiffs submitted a payment of $14,145.42 to become current. Nationstar rejected the payment and did not respond to the letter

20.     At the time the parties participated in the Early Neutral Evaluation ordered by the Court, in October, 2015, Nationstar still was demanding thousands of dollars not due, refused to justify or explain its charges, and had not produced basic loan documents, from data files, to

internal communications, to all the email communications between Bank of America and Nationstar that would show the extent and nature of Nationstar's continuing failure to implement the modification.

21.     Plaintiffs tried alternative means to understand the accounting.   In October, 2015, Plaintiffs deposed Binu Poudel, a senior accountant at Nationstar who had worked on the Castillos' loan.   A true and correct copy of relevant excerpts of her deposition is attached as Exhibit 6.  Poudel was able to interpret the accounting records in part, and testified that the Castillos had approximately $42,000 extra money in their account on November 8, 2013 that Nationstar applied to principal – completely contradicting Nationstar's claim that it could charge an escrow shortage because the Castillos had insufficient funds in their account to cover November, 2013 escrow charges.  *Id.* at 65-66.  She testified that changes to account even after Nationstar's initial admission of error repeated the overcharges of over $5,000 a month.  *Id.* at 112-114.  (Ms. Poudel also provided testimony to support other claims – she testified, for example, that she could not understand either Nationstar's narrative "explanation" of its error to the Castillos, or its transaction history. *Id.* at 105-106.)

22.     Plaintiffs also deposed Kelsey Grimm, the "loan modification acquisition manager" in charge of getting the Castillos' loan modification reflected properly in Nationstar's servicing systems, Grimm Deposition at 13-14, in order to understand how the error took place.  Grimm confirmed the Plaintiffs' interpretation of the loan modification contract. *Id.* at 95.  She also testified that Bank of America had transferred funds sufficient to cover all the Castillos' arrears.  *Id.* at 127. A true and correct copy of relevant excerpts of Ms. Grimm's deposition testimony is attached hereto as Exhibit 7.

23.     Armed with this testimony, Plaintiffs moved to compel Nationstar to explain what the Plaintiffs allegedly owed each month in response to Interrogatory No. 2.  ECF 32 at 2:22-28 (Joint Letter).  Nationstar claimed the Castillos were not entitled to an amended answer, *id.* at 5:1-4, but amended their responses on the eve of the hearing.   The new response dropped any claim to an escrow shortage, claimed that plaintiffs stated the Plaintiffs owed

$3,172 each month (nearly $200 a month less), but still claimed, without explanation or breakdown, that the Castillos were in arrears by $18,822.37. ECF 78-7.

24. Nationstar's amended discovery responses did not resolve the accounting questions, however, as they included no breakdown of what the Castillos owed each month, still demanded thousands of dollars more than the Castillos owed. Although the accounting records showed Nationstar was revising its accounting, stripping payments and reapplying them repeatedly, Nationstar was still making the same error of charging the Castillos over $5,000 a month for an escrow shortage. *See* Poudel Depo., Exh. 6 hereto, at 113-114. In other words, Nationstar's accounting continued to be based on the assumption that $5115 was due each month, and any payment less than that was insufficient.

25. On February 19, 2016, the Castillos paid Nationstar the amount Nationstar's revised discovery response claimed was due for the months it had rejected payments altogether (a total of $13,950.72). *See* ECF 86-18 (Notice of Error explaining calculation). The Castillos still disputed the extra, unexplained thousands of dollars Nationstar claimed was due. Nationstar rejected Plaintiffs' payment of $13,950.72 several days later.

26. Plaintiffs needed to understand the accounting to show both that they had complied with the contract (which Nationstar denied) and to show Nationstar's overcharges, in violation of the Rosenthal Act. Only with a fine-grained understanding of the accounting, and pointed, line-by-line questioning about the transaction history, were Plaintiffs were able to force Nationstar to admit it had made the same errors repeatedly and even compounded them, despite being on notice – a crucial component of their claim under RESPA that Nationstar failed to conduct a reasoanble investigation, and of their negligence claim. *See* Deposition of A.J. Loll at 66-67, 72, 77, 87, 141-142, 193-94, 244 (describing repeated errors). Relevant excerpts of Mr. Loll's deposition on behalf of Nationstar is attached hereto as Exhibit 8.

27. Even more importantly, Nationstar was still holding the Castillos in "foreclosure status." Although Nationstar had started accepting payments again, it eventually stopped applying the payments to the account, instead placing funds in a "suspense account." A true and correct copy of the Castillos' July, 2016 mortgage statement, showing over $31,000

DECL. OF ELIZABETH LETCHER ISO PLS' MOTION FOR FEES, COSTS AND EXPENSES

allegedly due, and featuring the warning "Your loan is currently in the foreclosure process" prominently on the second page, is attached as Exhibit 9.   Until Plaintiffs could force Nationstar to actually correct its accounting, the risk of foreclosure would remain.

28.     Plaintiffs ultimately invoked the discovery dispute process again to get an answer.  ECF 54 at 4 (Joint Letter).  The Court had ordered Nationstar to respond to Interrogatory No. 2 at the end of July, 2016, ECF 58.   Nationstar responded in mid-August, 2016, revising its demand for the amount due from over $18,000 to $11,494.22.   A true and correct copy of Nationstar's final amended version of its response to Interrogatory No. 2, served in September, 2016 and showing each prior iteration, is attached hereto as Exh. 10.

29.     Nationstar Vice President A.J. Loll testified that he himself did this calculation.  Loll Depo, Exh. 8 hereto, at 112-113, 144.   Even Mr. Loll's final calculation turned out to be incorrect, however.   The Castillos immediately paid the $11,494.22 Nationstar claimed was due, ECF 77-5, but in the following weeks, Nationstar refunded to the Castillos $6,010.94, ECF 77-6 (refund check), and $837.38 (refund check), ECF 77-7, instructed them that they need not make their September, 2016 payment of $3,172.12 (Gruber email), and later stated they were due an additional refund of $456.20.  ECF 86-1 (Gruber email).

30.     I spent 39.9 hours, and Mr. Kennedy spent 14.5 hours, on simply understanding and attempting to resolve the accounting issues – apart from strict discovery and motion practice.  These hours were spent on tasks from calculating amortization of the loan, to trying to understand Nationstar's cryptic, multiple revisions of the accounting over two years, to trying to resolve the accounting disputes through the statutory Notice of Error procedure set out in RESPA.  An enormous amount of this work could have been avoided if Nationstar had either communicated in good faith about its accounting (a process the Plaintiffs tried to start with their May, 2015 letter) or competently investigated the accounting.  Mr. Loll was involved in the litigation from the very beginning – he actually signed the *Castillo I* settlement that referenced the modification on behalf of Nationstar, and verified Nationstar's first responses to discovery that actively evaded stating what was due.  ECF 78-5 at 15.  Yet despite a year and a half of litigation and statutory Notices of Error, no one at Nationstar was able to correct the account

and get the Castillos out of foreclosure status until Mr. Loll prepared for his deposition in August, 2016. Mr. Loll testified he couldn't explain why it hadn't been done at the very beginning of the litigation. Loll Depo., Exh. 8 hereto, at 148-149.

31.     In general, fact investigation in mortgage cases can be particularly time consuming because tens, if not hundreds, of individuals handle every loan, and records are dispersed across multiple departments and records keeping systems. The starting point of our discovery was a timeline from accounting changes, debt collection, customer service and manager notes, research department reviews, foreclosure records, and email and other internal correspondence to understand how Nationstar handled the loan. Without a chronological synthesis, for example, it would be impossible to tell whether foreclosure was proceeding as Nationstar identified errors; to see what changes (if any) Nationstar made to the account or to the credit reporting in response to the Castillos' Notices of Error. Here, the synthesized timeline made it possible to identify see where records were missing, and to highlight the failures to communicate between departments that contributed to Nationstar's ongoing errors. This time spent on understanding Nationstar's actions – obscured by proprietary systems and never explained – was reasonable and necessary. Mr. Loll himself, who has over 30 years' experience in the industry and is Nationstar's Vice President of Litigation Support, testified that he spent over "well over 100 hours" to "understand exactly what took place," and prepare to testify. Loll Depo., Exh. 8 hereto, at 69.

**Protracted, Contested Discovery**

32.     Nearly all the documents Plaintiffs sought (RFP 1-6, 9, 11, 14-18, 21-24, 27-48, 53, 58-60, 66-69) and obtained (6018 of 6571 pages disclosed – see chart below) related specifically to the Castillos' mortgage account.[1]   Nonetheless, it took Nationstar well over a year to disclose these documents:

---

[1] Only a few requests related to Nationstar's training, policies and procedures for responding to disputes such as the Castillos' (RFP 10, 19-20, 24-26, 49-50); to documents governing the loan pool (RFP  12, 13, 54, 55), similar complaints against Nationstar (RFP 51), Nationstar documents identifying problems with modifications and servicing transfer (RFP 52), and documents supporting contentions.  (RFP 7, 8, 61-65).  Only a few Requests for Admission did

| Bates Nos. | Pages | Date Disclosed | Content |
|---|---|---|---|
| NSR1-2060 | 2061 | 9/10/15 | Castillo loan servicing records (LSAMS, Transaction History, foreclosure records, spreadsheet, imaged documents) |
| NSR2061-2091 | 30 | 11/25/15 | Castillo credit reporting documents |
| NSR2319-2342 | 23 | 10/20/15 | Castillo loan data sent to Nationstar by Bank of America |
| NSR2343-2358 | 15 | 11/25/15 | Castillo communications with Nationstar and "Sharepoint" system requests |
| NSR 2359-2486 | 127 | 11/25/15 | Castillo credit reporting |
| NSR2567-5849 | 3282 | 11/25/15 | Emails concerning Castillo account |
| NSR5850-5958 | 108 | 2/16/16, 3/3/16 | Castillo servicing records updated |
| NSR5959-6230 | 271 | 6/27/16 | Castillo "AS400" records from Bank of America's servicing of loan |
| NSR6231-6329 | 98 | 8/16/16 | Castillo servicing records updated |
| NSR 6572-6576 | 4 | 8/24/16-10/16/16 | Castillo check and Loll notes |

33.     In July 2015, plaintiffs propounded their first set of discovery, which included a request for all documents related specifically to the Castillos' account. (RFP No. 1). Defendants disclosed servicing records in September, 2015, but responded to virtually every document request in the first set identically as follows: "Notwithstanding the foregoing objections, Nationstar responds that it has produced a copy of its Collection History Profile, LoanSphere BK/FC Notes, Detail Transaction History, and a spread-sheet settling for all account activity, payments, reversals, and modification activity for the subject loan and will produce its remaining loan file." Nationstar Responses to Plaintiffs' Requests for Production Set 1, attached hereto as Exh. 11. Defendants made no attempt to respond to the individual request, or to inform Plaintiffs whether the specific documents sought would be produced. Accordingly, plaintiffs had no idea whether defendants would comply with the various requests, and had to meet and confer to force

not relate directly to the Castillos' loan - those intended to establish uncontroversial elements of statutory claims (RFA 1-2, 19) to support establish industry standards for interpretation of modification language (RFA 68-69), or confirm the meaning of credit reporting codes (RFA 71-72).

DECL. OF ELIZABETH LETCHER ISO PLS' MOTION FOR FEES, COSTS AND EXPENSES

Nationstar to amend its responses in such a manner as to inform plaintiffs whether or not it would produce the documents sought.

34.     Whether because of failure to investigate and respond in good faith, or intransigence, Nationstar repeatedly claimed documents simply didn't exist, only to disclose them months later.

35.     For instance, Nationstar denied during the meet and confer process that it had received data files from previous servicer Bank of America, *see* ECF 32-6 at 14, which could help confirm or deny its defense that it had received incorrect information about the loan. This was an issue in the case because Nationstar's "bona fide error" defense to plaintiffs' Rosenthal Act claim asserted that its mistake was caused by receiving inaccurate information from Bank of America.  It disclosed the data files only on October 20, 2015, after Ms. Grimm testified that they did exist.

36.     It took Nationstar until the end of November, 2015 to produce email communications between Nationstar and Bank of America.  Although there were fewer than 60 email communications, *See* ECF 79-6 (emails), 79-8 (summary), Nationstar produced *all* of every email chain – over 3,000 pages (NS2761-5849) - without differentiating between emails or indicating which attachment went with which chain.  Plaintiffs had to painstakingly and pointlessly parse which attachments went with what emails (crucial because Nationstar had claimed it was unaware of the underlying circumstances of the modification during that period) and serve Requests for Admission 50-58 to confirm the dates and recipients of the crucial documents that were sent.

37.     Nationstar flatly denied that it had any key to its own servicing codes used in its records, even though Ms. Grimm had testified to using it.  ECF 32 at 5:15-16 ("No key exists for the codes and abbreviations used in Nationstar's servicing records.")  Plaintiffs included this issue in their first discovery dispute.   At the January, 2016 hearing, the Court ordered the parties to further meet and confer.  The parties agreed to resolve this dispute and others about missing servicing records with a short 30(b)(6) deposition of a records custodian.  Plaintiffs therefore had to identify each code they wanted interpreted, and take the time and expense to depose

Nationstar's Keith Kovalic in June, 2016.  Preparing for and taking the deposition took 16.6 hours. See Exh. 1 hereto, entries for 2/25/16, 2/29/16, 3/1/16, 4/26/16, 6/20/16, 6/21/16; see also Exh. 12 at 6-18. Not surprisingly, Mr. Kovalic testified that keys in fact did exist.  Kovalic Depo. at 33-35, relevant excerpts of which are attached as Exhibit 12.

38.     Similarly, Nationstar stated, in its March, 2016 response to a follow-up discovery request (Request for Production No. 58), that it had none of the day-by-day servicing records from Bank of America's handling of the loan ("AS 400" records), even though Ms. Grimm had testified they were available.   In his deposition, however, Mr. Kovalic admitted that Nationstar had them. Kovalic Depo, Exh. 12 hereto, at 60:2-61:10.  Only then did defendants produce the AS400 records (NSR5959-6230).

39.     Plaintiffs sought all of Nationstar's communications with credit reporting agencies (RFP 21).   Although Nationstar disclosed some of its responses to the credit reporting agencies to the Castillos' credit disputes, and its own requests for correction, it refused to disclose the monthly reports themselves.  Plaintiffs also sought the reporting information through Interrogatories 16 and 20.  Nationstar disclosed only part of its reporting, and Plaintiffs were forced to bring the issue to the Court.  Joint Letter, ECF 32 at 3-4.  Judge Cousins ordered disclosure, ECF 40 at 2, and Nationstar updated its responses in late February, 2016.   The entire episode could have been avoided if Nationstar had disclosed the actual "individual monthly data report forms," which Mr. Loll testified he reviewed to prepare for his deposition.   Loll Deposition volume II at 26- 27, attached hereto as Exhibit 13, but Nationstar never disclosed.

40.     Plaintiffs sought disclosure of the contact that sold servicing rights for the Castillos' loan to Nationstar.  This agreement required Nationstar to honor modifications entered into by Bank of America, and to made the borrowers third party beneficiaries of that provision; it ultimately formed the basis of Plaintiffs' Seventh Cause of Action.   In their first set of written discovery, Plaintiffs described this as the "Servicing Transfer Agreement … under which Nationstar began servicing PLAINTIFFS' LOAN."   Nationstar first simply refused to produce the document.  During meet and confer efforts, Plaintiffs explained why the contract by which Bank of America had sold servicing right to the Castillos' loan to Nationstar was relevant, both

letter dated September 16, 2016, and during a meet and confer telephone call September 29, 2016. Nationstar's amended response, served at the end of November, 2016, responded that "the item requested does not exist." As the parties met and conferred over a dispute letter to Judge Cousins, Plaintiffs pointed out that Nationstar's public SEC filings refer to such "purchase and sale" contracts. ECF 54-6 at 3:22-23 (draft joint letter). Nationstar responded: "If Plaintiffs want production of a 'purchase and sale contract' they should request that." *Id.* at 6:10-19. Rather than bring the matter to Judge Cousins, Plaintiffs served a new request for production using Nationstar's terminology. Nationstar still refused to produce the document. (Exh. 2 at 7-8). After six weeks of meeting and conferring, Nationstar said it will produce the contract "if it exists." Plaintiffs pointed out that the document was referred to in Nationstar's own policies and procedures, and on the SEC website. Plaintiffs also pointed out that the body of a January 6, 2013 purchase and sale agreement between Nationstar and Bank of America (without the loan schedules) was publicly available.

http://www.sec.gov/Archives/edgar/data/1520566/000119312513009512/d461579dex21.htm; ECF 54 at 3:8-20; *see also* ECF 51-10 (excerpts of agreement), though plaintiffs still needed Nationstar to produce the agreement, as it was not clear whether the publicly available agreement was the one that pertained to the Castillos' loan, or whether theirs was transferred under a different contract. This Court ordered disclosure. ECF No. 58 at 2:6-12.

41. Some documents were never disclosed solely because Nationstar misrepresented how they were stored. For instance, Ms. Grimm testified that the department boarding transferred modifications were *asked to* list "Lessons Learned" – "what went wrong, what can we do to be better." Exh. 7 *supra,* Grimm Depo. at 54-55. Because such a summary might show that the problems Nationstar claimed were "unique" were endemic to the transfer process, the Castillos sought disclosure of "lessons learned" during acquisition/transfer of new loans. Nationstar claimed finding them would be burdensome they were kept in individual customer files. ECF 54 at 5:7-13 ("The documents are not stored in an archive, categorized according to topic, or kept for a set length of time. With perhaps some exceptions, any documents relating to the so-called 'Lessons Learned' that exist would be stored in individual loan files…. This could

require looking through hundreds of thousands – if not more - loan files." On that basis, the Court declined to order production of the documents. ECF 58 at 1-2. Mr. Loll later testified they were kept in a single document in the Acquisitions department. Loll Depo. vol. II, Exh. 13, at 88.

42. Defendants knowingly designated documents "confidential" under the stipulated protective order (such as documents available on the SEC's website)) without a rationale for doing so, as described in paragraph 71 below.

43. Nationstar's indifference to discovery issues was illustrated by its response to Interrogatory No. 5, which sought the basis for its "bona fide error" defense. ECF 78-5, pp. 6-7 of 15. Nationstar's responses repeated the arguments made in the Motion to Dismiss (i.e. plaintiffs' supposed failure to keep Nationstar "in the loop" when negotiating the modification), and also cited plaintiffs' supposed failure to contact Bank of America after the service transfer to inform them that Nationstar was not correctly implementing the modification. *Id.* Nationstar's Opposition to Plaintiffs' summary adjudication motion did not assert these grounds to support its BFE defense, and in fact asserted completely different grounds which it had not included in its response to Interrogatory 5. Specifically, Nationstar's opposition claimed that it had mistakenly removed a litigation code, and had a procedure of assigning repeated disputes to a different reviewer. ECF 82 at 8:23-11:25 (Opposition to Motion for Summary Adjudication).

44. The parties ultimately submitted four Joint Discovery Letters, ECF Nos. 32, 54, 69, and 70. Much of ECF #32 was resolved by compromise after an extended conference with opposing counsel at the courthouse, with Nationstar agreeing to produce a witness to testify about several of the disputed issues, such as the key to abbreviations in the servicing records (*see* ¶ 37 above. Four discovery requests in ECF #32 were unresolved, and ultimately resolved by the court, two in favor of defendants and two in favor of plaintiffs. ECF #40.

45. ECF #54 was resolved by ECF #58 with split results, but more success for plaintiffs than Nationstar. ECF #69 was a motion to quash which sought to limit several subpoenas served on the Castillos' financial institutions. Plaintiffs were almost entirely successful in limiting the subpoenas. ECF #73. ECF #70 was defendants' attempt to reopen

plaintiffs' depositions. The court refused to re-open the depositions. The only success defendants obtained in this motion was that the court required plaintiffs to state a dollar figure for their emotional distress damages.

46.    All in all, Plaintiffs served five sets of discovery.   The first sought basic loan related documents and communications, the identity of those involved in handling the loan, and credit documents, and basic contentions about defenses.   The second sought Nationstar's policies and procedures for handling credit disputes, and specific documents referred to in the servicing notes but not disclosed.   The third set sought policies and procedures for booking loan modifications, the purchase and sale contract, complaints of similar errors, records about payments received by Nationstar but rejected, the identities of later decision makers, and admissions about Nationstar's early knowledge about and handling of the loan modification. The fourth set sought defendants' position concerning the accounting issue, information about attachments to the 3,000 pages of email chains disclosed, and information and documents concerning the hardship defense.   The fifth set sought information concerning Nationstar's defense claiming that Plaintiffs were to blame for not forwarding certain emails to Nationstar, and a few other issues.

47.    In my experience in litigating mortgage servicing cases, Plaintiffs cannot build an effective case by relying solely on the testimony of the servicer's professional witness.  Relying on the fact that servicing decisions are dispersed over multiple departments and hundreds of individuals, servicer deponents will often simply say they don't know the answer to difficult questions or disclaim understanding of unfavorable facts or documents.   It's therefore critical to create an affirmative case – and lay the groundwork for an effective deposition of the servicer – by getting testimony from individuals who actually handled the loan.  Their testimony will vividly show the jury their level of training, the conditions under which they work, whether they understand what they are doing, and the level of service they provide.

48.    This is a critical strategy for proving both compensatory damage claims, and claims for statutory and punitive damages.   Plaintiffs sought to build a credible case for punitive damages under the Fair Credit Reporting Act, which authorizes punitive damages under 15

DECL. OF ELIZABETH LETCHER ISO PLS' MOTION FOR FEES, COSTS AND EXPENSES

U.S.C. §1681n, as well as under California Civil Code 3294 by showing that defendants acted with willful or conscious disregard of plaintiffs' ownership rights to their home and their credit rating. A showing of willfulness on Nationstar's part was also necessary to obtain civil penalties for plaintiffs' other claims. These included the Rosenthal Act, California Civil Code 1788.30(b), which allows a civil penalty for willful violation, RESPA, 12 U.S.C. § 2605(f)(1), which allows a civil penalty upon showing of a "pattern and practice" of RESPA violations, and the California Consumer Credit Reporting Agencies Act, California Civil Code § 1585.31(a)(2)(B), which allows an award of up to $5,000 per violation if the violations were willful. Accordingly, Plaintiffs implemented a plan to obtained Nationstar's internal documents and depose their front line employees to build a case for such civil penalties and punitive damages.

49.     For instance, Plaintiffs deposed Ashley Gregory, one of several customer service representatives who reviewed the Castillos' dispute in 2014 but (mistakenly) found "no error." See ECF 86-10. She testified she "didn't have the means" to contact Bank of America directly, which hampered her ability to resolve disputes about transferred loans. Exhibit 14 at 46:3-47:11; 50:3-7. After reviewing her own letter to the Castillos, she couldn't understand or explain why she had rejected the Castillos' position. *Id.* at 65-20; 68:20; 82:4-83:7.

50.     Plaintiffs deposed Gregory Savells, who reviewed the Castillos' last dispute pre-suit complaint. He could not explain why the three prior reviewers found "no error," Exhibit 15 at 24:14-25. He testified that even though he identified an error on the Castillos' account and was aware of the pending foreclosure, he saw no evidence in the records that he took any steps to try to stop the foreclosure. *Id.* 54:5-56:10. He also testified that he would normally be working on 70-80 disputes at a time, and about Nationstar's daily, public updates of how many disputes each employee was handing, including one that exhorted workers to "turn and burn" to process complaints on the last day of the month. *Id.* 60:23-62:24.[2]

51.     It was this kind of testimony that would effectively counter what I knew was Nationstar's stock defense – that the repeated errors on the Castillo account were a unique,

---

[2] Mr. Kennedy also prepared to depose David Grasham, another former Nationstar employee who had responded to a dispute, but he did not appear.

1   inexplicable, one-time occurrence. This was the defense it offered in *May v Nationstar, ED*

2   *Mo. Case No* 14-cv-0578 TCM, a closely analogous case where Nationstar's failures to correct

3   accounting errors or respond to written complaints brought the homeowner to the brink of

4   foreclosure.  Mr. Loll's excuse that the customer relations department was generally "good at

5   what they do", Loll Depo, Exh. 8 hereto, at 193, and "excellent at doing their job" *id.*  at 193,

6   196, and that he was "frustrated" and "surprised" that so many representatives were unable to

7   solve the problem, *id.* at 116-118, 194, 196 was belied by the first-hand testimony of the

8   employees doing the work.

9          52.    Ms. Grimm's testimony similarly showed Nationstar knew its systems for even

10  booking the transferred loan were hopelessly flawed.  A year and a half out of an undergrad art

11  degree, she managed the entire department handling loans transferred during the modification

12  process.  Exh. 7 hereto, Grimm Depo. at 9, 13, 14.  She did not understand the acquisition

13  process, or even know what departments were involved.  *Id.* at 29, 64, 73.  She debunked

14  Nationstar's claim that the modification had been reviewed by underwriting. *Id.*  at 135- 136.

15  Although Nationstar blamed its error on a "change request form" supposedly from Bank of

16  America, Grimm explained it was in fact a Nationstar form, that could not have taken

17  precedence over the language of the modification itself. *Id.*  at 99, 146-147. explained that the

18  lower balance of the Castillo modification should have been a "red flag," *id. at* 108, 129, and

19  that if she had had access to Bank of America's servicing notes on transfer, she would have tried

20  to contact Bank of America directly.  *Id.* at 125.   She testified that the department was

21  overworked, working overtime to process "escalated" loans transferred from Bank of America.

22  *Id.* at 143-146.

23         53.    Plaintiffs deposed Keith Grant, a Nationstar employee who works in Scottsbluff,

24  Nebraska.   True and correct excerpts of relevant portions of Mr. Grant's deposition are attached

25  hereto as Exhibit 16.  Mr. Grant's testimony was particularly relevant to plaintiffs' claim for

26  punitive damages under the Fair Credit Reporting Act.  The FCRA allows for an award of

27  punitive damages upon a finding of a "willful" violation of the Act's provisions.  15 U.S.C.

28  §1681n.  "Under FCRA, a CRA or furnisher willfully fails to comply when it knowingly and

DECL. OF ELIZABETH LETCHER ISO PLS' MOTION FOR FEES, COSTS AND EXPENSES

1  intentionally commit[s] an act in conscious disregard for the rights of others." *Schaffhausen v.*

2  *Bank of America, N.A.,* 393 F.Supp.2d 853, 859 (D.Minn. 2005).

3    54. Mr. Grant handled some of the credit disputes which Nationstar received from

4  credit reporting agencies.  Pursuant to the FCRA, 15 U.S.C. § 1681s-2(b), a furnisher of

5  information which receives such a dispute is required to ascertain whether the information it is

6  reporting by conducting an investigation.  Despite the clear caselaw which requires a thorough

7  investigation, (*see, e.g., Gorman v. Wolpoff & Abramson, LLP,* 584 F.3d 1147, 1156 (9th Cir.

8  2009); *Johnson v. MBNA America Bank, NA,* 357 F.3d 426, 430 (4th Cir. 2004)("reasonable

9  investigation" with "some degree of careful inquiry")) Mr. Grant testified that in almost all

10 cases, his process was to simply compare the data in the Nationstar's system (called LSAMS)

11 with the disputed information reported by the credit reporting agencies (set forth on a form

12 called an ACDV).  Changes to the credit reporting would be made only if there were a difference

13 between the information on LSAMS and the ACDV.  Grant Depo., Exh. 16 at 111:13-112:10;

14 142:10-145:18.   Given that the information on a consumers' credit report which caused the

15 consumer to dispute the matter originated from Nationstar's system, Nationstar's "investigation"

16 was pointless, and constituted a willful violation of the FCRA.

17   55. The only time that this was not the case was when "exceptions" applied, but Mr.

18 Grant acknowledged that "exceptions" were uncommon and could not estimate how many

19 exceptions he had even handled. Grant Depo, Exh. 16, at 113:6-115:16.  Mr. Grant also testified

20 that he couldn't recall not being able to finish an investigation on the same day he started. 94:4-

21 95:22.

22   56. In all plaintiffs spent 643.3 hours on discovery matters (342 for me, and 301.3 for

23 Mr. Kennedy).  This included responding to Nationstar's written discovery; interrogatories,

24 document requests, and requests for admissions, defending daylong depositions of Jennifer and

25 Jason Castillo, and attending Nationstar's depositions of Ms. Castillo's mother, Elizabeth

26 Bartholomew and two of the Castillos' neighbors, as well as opposing their motions.

27 **Hardship Defense/Summary Adjudication**

28

57.     The litigation took a completely unexpected turn when the defendants refused to answer written discovery aimed at nailing down the amounts due under the contract on the ground that modification itself might be "unenforceable."   Defendants deposed the Castillos in early February, 2016.  Nationstar asked the Castillos to reconstruct their income and expenses for the past decade from memory.   After that date, the Defendants reversed their earlier position that they were indeed required to honor the modification, arguing that the modification itself might be unenforceable if the Castillos were not "experiencing a financial hardship" at the time they signed the modification.

58.     Nationstar even refused to respond to discovery that attempted to break down the dollars and cents the Castillos allegedly owed on this ground – refusing to answer an entire series of foundational discovery on the basis of this "hardship defense."   For example, much of Plaintiffs' Fourth Set of discovery was devoted to forcing Nationstar to commit to the amounts the Castillos owed in escrow.  In response to a request that Nationstar admit the Plaintiffs owed no more than $765.03 per month for escrow during certain months (the amount the Castillos had calculated was due), Nationstar responded:

> Response to Request for Admission 35:   Nationstar is unable to admit this request because recent facts discovered in the deposition of Jason Castillo show that the 2013 Modification may possibly be unenforceable because the borrowers' yearly income between 2012 and 2015 was over $200,000 per year and their monthly expenses during that time period were less than $4,500.   Therefore, plaintiffs' material representation of a financial hardship was untrue.  On this basis, Nationstar denies this request.

59.     This "hardship defense" was unexpected for two fundamental reasons.   First, Nationstar had already admitted in its Answer to the First Amended Complaint that "Nationstar, as the new servicer, is required to service the loan under the terms set out in the 2013 Loan Modification."  ECF 18, ¶ 60, ECF 19, ¶ 4.  Second, the assertion that Plaintiffs had obtained the 2013 Loan Modification on the basis of a claim of "financial hardship" had utterly no basis in fact.   As the correspondence between the parties (all disclosed months prior) made crystal clear, the modification was offered during the *Castillo I* litigation between the Castillos, Bank of America, and the investor Wells Fargo not to resolve a contemporaneous financial hardship, but

to approximate a *2010* modification that Bank of America had extended to the Castillos and then reneged upon.

60.     The "hardship defense" radically upped the stakes for the Castillos, putting the modification itself in jeopardy, and their ability to stay in their home at real risk.   If the Castillos lost their claim that defendants were still unlawfully charging them thousands of dollars for escrow shortage and other default fees they did not owe, they would find a way to pay the disputed amounts and stay in their home.   However, if Nationstar prevailed on a theory that the modification was unenforceable, they would owe mortgage payments under the original, unmodified loan from 2005 – and owe potentially hundreds of thousands of dollars more. *See, e.g.,* ECF 77-8 (statement showing $142,661.79 allegedly due under unmodified contract in 2013).

61.     Plaintiffs' counsel were forced to develop an entire defensive as well as offensive case.  First, to offer an alternative basis for contract liability and lay out the clear facts showing the parties to the 2013 Loan Modification never intended to require current financial hardship, even though the words appeared in the standardized form Bank of America ultimately used.  Second, Plaintiffs developed purely legal arguments to counter the "hardship" theory – from how to interpret ambiguity in contract, to compiling admissible evidence of what "hardship" means in industry standard modification programs, to evaluating new claims (such as breach of the settlement agreement), new defendants (like Bank of America), and the risks a court or jury determination that the modification was not enforceable.

62.     Because the intent of the parties in negotiating the 2013 Loan modification was suddenly at issue, the universe of relevant facts and documents expanded by years to include Bank of America and Wells Fargo's internal and external handling of the 2010 modification, and its multiple efforts to approximate that modification with a new one, to and including the *Castillo I* settlement process.  (As A.J. Loll, Nationstar's corporate representative, stated in his deposition, this case involved more than twice as many documents as any case he had ever handled.  Loll Depo. vol II, Exhibit 13 hereto, at 23.   I located, interviewed and obtained a declaration from George Keller, the defendants' counsel in *Castillo I.*  I spent a number of hours

familiarizing myself with the Castillos' finances as they stood three years earlier in October

2013, when the modification was signed.  This task involved some complexity, as the Castillos

operate multiple small businesses in partnership with other individuals.  Understanding the

Castillos finances was necessary because, if our legal theories about the intent and meaning of

the modification language failed, we be forced to litigate the issue of whether the Castillos were

experiencing an actual financial hardship in October 2013 when the modification was signed.

63.     In April, 2016, Plaintiffs moved to file a Second Amended Complaint to add

RESPA violations accrued since the litigation began, and to add allegations relevant to

Defendants' "hardship defense."   ECF 45.  Prior to filing the motion, plaintiffs asked defendants

to stipulate to the filing of the SAC.  Defendants would not stipulate, even though virtually all

the new facts were all but indisputable from the documents disclosed. and in fact opposed the

motion. The motion was granted in August, 2016.  ECF 60. Mr. Kennedy spent 17.8 hours, and I

spent 34.8 hours, for a total of 52.6 hours, on the Second Amended Complaint, motion to amend,

and the related administrative motion practice.  ECF 42-42-7 (Motion to Seal), 45-46-10

(Motion, Declaration and Exhibits); 49- 51-13 (Reply, Declarations and exhibits).  The Court

granted the motion to amend in August, 2016.  ECF 60.

64.     Plaintiffs deposed Wells Fargo, the investor on the loan, and Mr. Loll in August,

2016, to show that Bank of America's decisions and representations while negotiating the 2013

Loan Modification (as well as its judicial admissions in *Castillo I*) were binding on the successor

servicer, as well as to develop testimony about the *objective* "hardship" standards the investor

was applying.

65.     The Motion for Summary Adjudication set out Plaintiffs' opposition to the

"hardship defense" in detail.   ECF 76 at 16:20-26:16 (Motion); ECF 78- 79-15 (Letcher

Declaration and Exhibits in Support).   Plaintiffs had to resolve both the "hardship defense" and

the accounting issues with the court – or face the difficult task of presenting these complex,

distracting, document-heavy and ultimately peripheral contract issues to a jury, while

simultaneously asserting affirmative claims for unfair debt collection, RESPA, and wrongful

credit reporting.

DECL. OF ELIZABETH LETCHER ISO PLS' MOTION FOR FEES, COSTS AND EXPENSES

66.     Despite having relied on and referred to its "defense" that the contract was unenforceable or voidable for months, Nationstar evaded a ruling by claiming it had never actually asserted the defense, and planned to use "hardship" evidence only to impeach the Castillos' credibility.  ECF 82 at 12:1-11.

67.     The Motion for Summary Adjudication established the defendants' liability for breach of contract – establishing the basis for all Plaintiffs' other claims, that the foreclosure threats, default fees, and additional charges violated the Rosenthal Act; that Nationstar was negligent; that its failure to correct the account violated RESPA, and that the incorrect credit reporting violated federal and state credit reporting laws.

68.     The Motion for Summary Adjudication also established Nationstar's liability for unfair debt collection, in violation of the Rosenthal Act, and dispensed with Nationstar's "bona fide error" defense.  ECF 93 at 8-12.

69.     In all, Plaintiffs' counsel spent 219.6 hours – 74.6 by Mr. Kennedy, and 145 by Ms. Letcher, on the motion for summary adjudication and the additional research and investigation relating to the "hardship" defense (apart from discovery).   Many of these hours were made necessary only by Nationstar's strategic, disingenuous "hardship" theory, advanced to pressure the Castillos with possible loss of their hard-won modification (and therefore their home).

**Mediations**

70.     The parties attended an Early Neutral Evaluation session with Stephen Pahl, Esq. on November 5, 2015, a mediation with the Hon. Kevin Murphy on September 13, 2016, and a settlement conference before Hon. Nathaneal Cousins on January 10, 2017.  I spent 37.3 hours, and Mr. Kennedy spent 40.6 hours, preparing for and attending these alternative dispute resolution meetings.

**Miscellaneous**

71.     Plaintiffs spent approximately 104.9 hours (57.1 for Mr. Kennedy, and 47.8 for Ms. Letcher) on other litigation tasks, including pure investigation and development of legal theories, case management statements, client communications, and consultation with experts,

and, as the Ninth Circuit put it, "complying with the myriad requirements of the Federal Rules of Civil Procedure." *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1151 (9th Cir. 2001). This time included three largely unnecessary Administrative Motions to Seal because of Nationstar's confidential designations. Nationstar marked hundreds of pages of servicing records it received from Bank of America as confidential. NSR 595-1857. Although Plaintiffs sought to meet and confer over the designations, first by letter dated September 16, 2015, and by telephone on September 22, 2016, Nationstar refused to withdraw the designation. Plaintiffs were therefore forced to file a time-consuming Administrative Motion to File under Seal for each document or motion that referred to those crucial documents. *See*, e.g., ECF 33 through 33-3; ECF 42 through 42-7. When this Court ordered Nationstar to further justify its confidential designation, ECF 44, Mr. Abbott explained in an April 25, 2016 phone conference that Nationstar would only further defend its confidential designation for its own policies and procedures, not Bank of America documents. Nationstar never answered a May 13, 2016 letter seeking to confirm that Nationstar had withdrawn its "confidential" designation from the documents.

**Trial Preparation**

72. Plaintiffs spent 189.8 hours preparing for trial. The bulk of the time Plaintiffs spent preparing for trial and the January 12, 2017 pretrial deadlines could have easily been avoided but for Defendants' decisions. At the summary adjudication hearing on November 14, 2016 the court stated that it intended to order the parties to participate in a settlement conference with the Hon. Nathaneal Cousins. At that conference, defendants counsel Thomas Abbott requested that the conference be set soon, and plaintiffs concurred. Judge Cousins set the conference for December 1, 2016. Shortly after the date was set, Mr. Abbott contacted Mr. Kennedy and indicated that his client was unavailable the entire month of December. Therefore, the settlement conference was reset to January 10, 2017.

73. On November 23, 2016, Mr. Kennedy sent an email to Mr. Abbott inquiring as to whether defendants were interested in renewing settlement discussions with the help of Ret. Judge Kevin Murphy of ADR Services, with whom the parties had engaged in a September 13, 2016 mediation. Exhibit 17. Mr. Kennedy had been in contact with Judge Murphy, who

DECL. OF ELIZABETH LETCHER ISO PLS' MOTION FOR FEES, COSTS AND EXPENSES

1   indicated a willingness to assist with such post-mediation discussions, as is his policy. Mr.

2   Kennedy pointed out to Mr. Abbott that the January 10, 2017 Settlement Conference was just

3   two days before the documents required by Judge Freeman's civil trial standing order were due.

4         74.     Mr. Abbott proposed moving the trial date, but Plaintiffs were not in agreement

5   with giving up their trial date, as there was no certainty as to when trial would be reset, and the

6   Castillos were eager to resolve this litigation, which had been a stressful ordeal for them, as soon

7   as possible.

8         75.     In late December, 2016 Mr. Humphrey and Mr. Wallace were engaged, and they

9   participated in pretrial preparations.

10        76.     As there was no certainty that the matter would settle at the January 10 Settlement

11   Conference, Plaintiffs spent considerable time preparing for trial starting in late November,

12   2016. Indeed, the Court's standing order required that meet and confer efforts concerning the

13   Pretrial Settlement Conference filings began weeks in advance. Thus, Plaintiffs prepared

14   designations of testimony from eight video depositions, and of Mr. Loll's trial testimony in a

15   similar case, *May v. Nationstar*. They designated exhibits and discovery responses to be used at

16   trial, drafted *motions in limine*, prepared for objections to evidence, drafted jury instructions for

17   substantive claims, prepared disputed and undisputed facts, and law, and started drafting

18   Plaintiffs' trial brief. We spent significant time meeting and conferring on topics required by

19   this Court's Standing Order, and drafting the Joint Pretrial Conference Statement. Overall, I

20   spent 84.3 hours, Mr. Kennedy spent 53.1 hours, and Dave Humphreys/Luke Wallace spent 52.4

21   hours on trial preparation

22   **Post-Settlement Issues**

23        77.     On January 11, 2017, the parties reached a settlement. ECF 115 p. 5.

24        78.     The settlement stated: "This agreement contains material terms. The parties may

25   agree to a long-form settlement agreement, but one is not required for this settlement to be

26   enforceable." Nonetheless, defendants insisted on additional provisions favorable to them.

27   Defendants sent a "long form" agreement to Mr. Kennedy on January 20, 2017. Mr. Kennedy

28   redlined the agreement to remove terms which were favorable to defendants but were not

included in the January 11, 2017 agreement, including confidentiality, a provision barring any discussion of the case allegations, and agreement that if defendants did not comply with their agreement to remove derogatory credit, plaintiffs had no remedy for any damages suffered until after giving defendants a second chance to comply.  Defendants continued to insist on these provision, claiming that the January 11, 2017 agreement was a "term sheet" or "MOU" and thus not meant to be a complete agreement.  After an additional session with Judge Cousins on February 3, 2017 (which session had originally been scheduled for a mediation of the attorney's fee/costs issue) defendants relented and stated that they would comply with the January 11, 2017 agreement as written.

79.     Per the terms of the January 11, 2017 agreement, the $250,000 payment was due to the Castillos on February 10, 2017 (i.e. 30 days from the agreement).  Defense counsel Mark Lonergan informed plaintiff that Nationstar would not make the payment until plaintiffs had first filed a stipulation of dismissal pursuant to FRCP 41(1)(a)(ii).  In fact, Nationstar did not make the payment by the February 10 deadline.   Plaintiffs prepared a motion to enforce settlement agreement, and were about to file such motion when the issue was resolved at the February 24, 2017 session with Hon. Nathaneal Cousins.  Defendants agreed to give plaintiffs the $250,000 check in return for a stipulation of dismissal which specifically reserved the court's jurisdiction to hear this motion for attorney's fees and costs.

80.     Mr. Kennedy spent a total of 38.3 hours handling post-settlement issues described above.

**Results**

81.     All in all, the litigation provided a monetary benefit to the Castillos of over $286,000 in cash, refunds, or reduction in the amount of debt secured by their home.  In addition to the $250,000.00 nonconfidential settlement amount, Plaintiffs' counsel forced Nationstar to rescind the Notice of Default, thereby stopping the foreclosure process.  In response to Plaintiffs' disputes, Nationstar partially fixed the error by paying $19,000 of its own funds to the Castillos' escrow account.   Loll Depo., Exh. 8 hereto, at 43.  Between January, 2016 and August, 2016, when Mr. Loll finally audited the account, Nationstar reduced its demand for unpaid amounts by

DECL. OF ELIZABETH LETCHER ISO PLS' MOTION FOR FEES, COSTS AND EXPENSES

$7,328,15. *See* ECF 78-8 at 4:9, 5:23-24).  Even after that date, Nationstar further corrected its accounting by sending the Castillos refund checks for $6010.94 and $837.38, and telling them they were not required to make the September, 2016 payment of $3,172.12.

**Co-Counseling**

82.     At various times, defendants have been represented by Thomas Abbott, Megan Gruber, Mark Kate Sullivan and, more recently, Mark Lonergan.  During the great majority of this litigation, plaintiffs were represented by William Kennedy and Elizabeth Letcher.  Mr. Kennedy and Ms. Letcher have complementary focuses -- Mr. Kennedy's practice has focused on debt collection and credit reporting since its inception in 1993. While Mr. Kennedy has taken an increasing number of mortgage cases in recent years, those cases have not involved intricate matters involving mortgage accounting, modification rules.  Ms. Letcher focuses her practice on mortgage lending, including escrow, modification, and mortgage accounting issues.  Due to their different perspectives and specialties, together they provided a higher level of representation than either could have separately.

83.     With respect to court appearances, generally just one attorney would attend. Thus, just one attorney attended the following: July 30, 2015 Case Management Conference, September 21, 2016 hearing on discovery motions, and the Settlement conferences with Hon. Nathaneal Cousins on February 3, 2017 and February 24, 2017.  Both attorneys attended the Summary Adjudication motion hearing, and the first hearing on the motion to compel discovery (which involved a two hour conference with opposing counsel).  Mr. Kennedy and I attended the ENE, and the mediation.  Mr. Kennedy, Mr. Wallace, Mr. Humphreys and I attended the settlement conference with the Hon. Nathaneal Cousins on January 10, 2017 which led to resolution of the case.

84.     With respect to depositions, just one attorney attended the following depositions: Jason Castillo, Jennifer Castillo, Keith Kovalic, Elizabeth Bartholomew, Carole Stansbury, Shawn Stansbury.  Both attorneys attended virtually all of the FRCP 30(b)(6) depositions in which Mr. Loll was the deponent.  With respect to the depositions of Nationstar's front-line personnel, one attorney took the deposition, and one generally listened on the phone. The utility

for plaintiffs was that the non-questioning attorney, due to his or her different knowledge base, and less encumbered mind would often think of additional questions which arose out of the deponents' responses, and would provide those to the questioning attorney during breaks or in real time through text messages. Nonetheless, plaintiffs have removed "second chair" hours from this fee request, correspondingly to all depositions except the FRCP 30(b)(6) depositions of Mr. Loll.

85.     As trial approached, both defendant and Plaintiffs added to their litigation team. On November 28, 2016, senior attorney Mark Lonergan filed an appearance for defendants, presumably for purposes of trying the case. In late December 2016 David Humphreys and Luke Wallace joined the plaintiffs' team. Mr. Humphreys and Mr. Wallace were involved in trial preparation, and attended the January 10, 2017 settlement conference. They would have been the chief trial attorneys had the matter not settled. As outlined in their declarations, Mr. Humphreys and Mr. Wallace have had extraordinary success in trying similar cases across the country.

86.     In preparing this fee petition, Plaintiffs significantly cut the hours sought for each attorney in the exercise of business judgment. With respect to time spent on communications between counsel, and non-productive travel time, Plaintiffs have reduced their billing rate by half. Approximately 77 hours of my time are charged at $262.50 per hours (approximately 47 for communications and 30 for travel). As noted above, Plaintiffs have also eliminated any request for compensation for a second attorney's attendance at depositions, except for the FRCP 30(b)(6) depositions of A.J. Loll for Nationstar and Wells Fargo. Plaintiffs have not billed for administrative tasks, such as downloading materials from ECF and preparing documents for filing. I have also significantly cut my time, by more than 100 hours, (well over 10%) to ensure that Plaintiffs do not seek compensation for duplicative efforts or unnecessary hours.

**Hourly Rate**

87.     I seek an hourly rate of $525.00 for my time in this matter. I believe that that rate is reasonable. I am a 1994 graduate of Boalt Hall School of Law, Order of the Coif. After graduating, I served as a clerk for the Hon. Thelton E. Henderson and the Hon. James R.

Browning, and was a Skadden Fellow at the Employment Law Center in San Francisco. I have over 20 years' experience in complex federal litigation, including trial and extensive appellate experience. More detail about my experience at a small civil rights practice and in my own practice working with nonprofit and private civil rights and consumer rights firms is set out in my resume, attached as Exhibit 18.

88.     I have extensive experience and expertise in mortgage servicing and related debt collection issues. Since 2009, when I joined the Oakland nonprofit legal services organization Housing and Economic Rights Advocates (HERA), first as a staff attorney and later as the Director of Litigation, my practice has focused exclusively on foreclosure, mortgage servicing, and unfair debt collection cases. I have provided advice and in-depth advocacy to over 500 clients on mortgage and foreclosure. I have litigated wrongful foreclosure, mortgage servicing, and unfair debt collection actions, (including class cases, such as *Banks v. JPMorgan Chase*, Alameda Superior Court Case No. RG12614875), in both state and federal courts, obtaining millions of dollars in settlements for my clients. Nearly all have settled confidentially.

89.     I have been lead or co-counsel in many published cases on novel issues of law relating to mortgage and foreclosure issues, *McGarvey v. JP Morgan Chase Bank, N.A.*, Case No. 2:13-cv-2099, 2013 WL 5597148 (E.D. Cal. October 11, 2013)(successors in interest to mortgages and modification); *Esquivel v. Bank of America*, Case No. 2:12–cv–02502–GEB, 2013 WL 5781679 (E.D. Cal. October 25, 2013)(breach by recording second deed of trust); *Rowland v. JPMorgan Chase Bank, N.A.*, Case No. 14-cv-0036 LB, 2014 WL 3404945 (ND Cal. July 11, 2014)(negligence and economic loss rule).

90.     I have also I drafted multiple successful *amicus* briefs on cutting edge issues of mortgage law relied upon by appellate courts, including *Alvarez v. BAC Home Loans Servicing, L.P.*, 228 Cal.App.4th 941, 949 (2014), establishing a negligence cause of action for mortgage servicing cases; *Chavez v. Indymac Mortgage Services*, 219 Cal.App.4th 1052 (2013) and *Barroso v. Ocwen Loan Servicing,* 208 Cal.App.4th 1001 (2012), relating to modification contracts; and *Coker v. JPMorgan Chase,* 62 Cal.4th 667 (2016), relating to debt collection after short sale.

DECL. OF ELIZABETH LETCHER ISO PLS' MOTION FOR FEES, COSTS AND EXPENSES

91.     I have trained hundreds of attorneys on mortgage-related issues at national consumer law conferences, for the State Bar, and the Practicing Law Institute.  I have educated non-lawyers from consumers, to legislative staff, to labor unions on foreclosure and modification issues.   I have trained State Bar investigators and served as an expert witness for the State Bar on mortgage modification issues.  Since 2015, I have handled these issues in my own private practice.

92.     On December 9, 2016, the Alameda Superior Court awarded Housing and Economic Rights Advocates $500 per hour for my time incurred in 2012 to 2014 in *Banks v.JP Morgan Chase,* Alameda Superior Court Case No. RG12614875.  A true and correct copy of relevant pages of the class action settlement approving the settlement and fees is attached hereto as Exhibit 19 (*see* pages 15-16).

93.     I was recently awarded $425.00 per hour by the Eastern District of Missouri in *May v Nationstar, ED Mo. Case No* 14-cv-0578 TCM, for work performed in 2015.   Nationstar did not oppose my claim that $425.00 was a reasonable hourly rate *for the Eastern District of Missouri.*

94.     I believe that the hourly rates Plaintiffs seek are consistent with the reasonable hourly rates for similarly skilled and experienced attorneys in the San Francisco Bay Area. They are also consistent with the "Laffey Matrix," a schedule of rates compiled by the civil Division of the United States Attorney's Office in the District of Columbia, as adjusted upward for the Bay Area by 9%.  A true and correct copy of the Matrix, which I downloaded from at https://www.justice.gov/usao-dc/civil-division (2015-2017 Matrix at the bottom of the page), is attached hereto as Exhibit 20.

95.     I seek compensation for 30.4 hours expended to date on this fee petition. Attached as Exhibit 21 is a description of my time on the fee petition.   I expect to supplement the declaration with time spent on the Reply and hearing.

96.     In have incurred $3.219.75 in litigation costs.  Attached hereto as Exhibit 22 is a summary of my costs, along with the receipts therefor.

DECL. OF ELIZABETH LETCHER ISO PLS' MOTION FOR FEES, COSTS AND EXPENSES

97.     The Promissory Note relating to the Castillos' mortgage loan is attached as Exhibit 23.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Dated:  March 27, 2017

_/s/_____
Elizabeth S. Letcher

DECL. OF ELIZABETH LETCHER ISO PLS' MOTION FOR FEES, COSTS AND EXPENSES